**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CARMEN THOMPSON; RHONDA HARRIS;
JOANN BOYD; DORIS TINSLEY;
LORRAINE JOHNSON; ISAAC J. NEAL,
on their behalf and on behalf of all
others similarly situated,
Plaintiffs-Appellants,

v.

U.S. DEPARTMENT OF HOUSING &
URBAN DEVELOPMENT; HENRY G.
CISNEROS, SECRETARY OF HOUSING
AND URBAN DEVELOPMENT, In his
official capacity as Secretary of the
United States Department of
Housing and Urban Development;

HOUSING AUTHORITY OF BALTIMORE
CITY, a Municipal corporation;
DANIEL P. HENSON, III, in his
official capacity as Executive
Director of the Housing Authority
of Baltimore City and
Commissioner of the Baltimore City
Department of Housing and
Community Development;
MAYOR AND CITY COUNCIL OF
BALTIMORE,
Defendants-Appellees.

JONESTOWN PLANNING COUNCIL,
INCORPORATED,
Movant.

No. 99-1402

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-95-309-MJG)

Argued: May 5, 2000

Decided: July 12, 2000

Before WILKINS, MICHAEL, and TRAXLER,
Circuit Judges.

_____

Reversed by published opinion. Judge Traxler wrote the opinion, in
which Judge Wilkins and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Marc Alan Goldman, JENNER & BLOCK, Washington,
D.C., for Appellants. Edward Mark Buxbaum, WHITEFORD, TAY-
LOR & PRESTON, L.L.P., Baltimore, Maryland, for Appellees. **ON
BRIEF:** Susan R. Podolsky, JENNER & BLOCK, Washington, D.C.;
Barbara A. Samuels, Therese L. Staudenmaier, AMERICAN CIVIL
LIBERTIES UNION, Baltimore, Maryland, for Appellants. Wilbur D.
Preston, Jr., Harry S. Johnson, Dana C. Petersen, Lisa L. Walker, Elva
E. Tillman, WHITEFORD, TAYLOR & PRESTON, L.L.P., Balti-
more, Maryland, for Appellees.

_____

**OPINION**

TRAXLER, Circuit Judge:

In 1995, African-American public housing residents (the "Plain-
tiffs") filed a class action against the United States Department of
Housing and Urban Development ("HUD"), HUD's then-Secretary
Henry Cisneros, the Housing Authority of Baltimore City ("HABC"),

2

and various Baltimore officials, seeking to eliminate racial segregation and discrimination in Baltimore's public housing system. In 1996, the parties entered into a Partial Consent Decree (the "Consent Decree") resolving some of the issues raised in the complaint. In 1998, HABC and the Baltimore officials (together, the "Local Defendants") filed a motion in the district court seeking to modify a portion of the Consent Decree. The district court granted the motion, and the Plaintiffs appeal. We reverse.

I.

In their class action complaint, the Plaintiffs alleged that the Baltimore public housing system, which was established in the 1930s "as an officially segregated program," J.A. 20, had yet to be desegregated. The Plaintiffs contended that the defendants assigned white public housing applicants to "two formerly de jure segregated `white housing' projects that remain predominantly white," J.A. 21, while black applicants were assigned to "the formerly de jure segregated `Negro housing' projects [that] remain single race black projects." J.A. 21. The complaint also alleged that many of the original "Negro housing" projects were slated for demolition and that "virtually all the sites under development for replacement housing are located in minority areas and/or in areas where there are already large concentrations of low-income public housing." J.A. 21. The Plaintiffs alleged that unless the court intervened, the defendants would "rebuild segregation for generations of public housing families to come" and would "squander a rare opportunity to right a wrong of historic dimensions." J.A. 22.

Negotiations between the parties following the lawsuit resulted in an agreement formalized in the Consent Decree. The stated purposes of the Consent Decree include "provid[ing] for the redevelopment of the housing units which have been or will be demolished . . . [and] provid[ing] enhanced desegregative housing opportunities for residents of Baltimore City public housing." J.A. 778. To that end, Section XII of the Consent Decree provides that, until the defendants' obligations under the Consent Decree have been satisfied, "the Local Defendants will not seek public housing funds from HUD for public housing construction or acquisition with rehabilitation in Impacted Areas, and will not seek and engage in public housing construction

3

or acquisition with rehabilitation with State [Partnership Rental Housing program] funds in Impacted Areas." J.A. 835.

The Consent Decree defines "Impacted Areas" as those areas other than "Non-impacted Areas," and defines non-impacted areas by census tract numbers. Broadly speaking, impacted areas are areas with high concentrations of public or low-income housing or with high minority populations. Thus, the effect of Section XII of the Consent Decree is to require that new public housing financed with public funds be located in areas without high concentrations of minority residents or public housing. At issue in this case are the Local Defendants' current plans for Hollander Ridge and Cherry Hill, public housing developments located in impacted areas.

Built in the mid 1970s, Hollander Ridge is a 1,000-unit public housing development located on a 60-acre parcel of land on the eastern edge of Baltimore City. The site is cut off from the rest of the city by Interstate 95, and only one road provides access to the site. Hollander Ridge abuts the predominately white residential neighborhood of Rosedale. However, the relationship between Hollander Ridge and Rosedale residents has been so strained that, at the time of the hearing, the city was replacing a chain link fence with a wrought iron fence to completely surround Hollander Ridge, save for the lone entrance at the end of Hollander Ridge farthest away from Rosedale. The balance of the area surrounding Hollander Ridge is devoted to commercial and light industrial uses.

Hollander Ridge contains 522 family housing units located in 79 low-rise structures and 478 units of housing for the elderly located in a 19-story high-rise building. By the time the Consent Decree was entered into, the lack of regular maintenance and repair work had left Hollander Ridge in a shameful state of disrepair. When tenants moved out, routine repairs were not made and the units were generally allowed to remain vacant. The steeply-sloped topography of the site led to severe erosion problems, causing sanitary sewer lines to buckle and break, and exposing underground power lines. Many of the low-rise units were in need of substantial repair, including the replacement of heating and plumbing systems and upgrades of the electrical systems. Similar problems existed in the high-rise building, where many of the major systems needed to be replaced and the individual units

4

needed significant updating. The high-rise building also suffered from structural problems that allowed water to leak into many units.

Shortly after entering into the Consent Decree, the Local Defendants, at the urging of HUD, applied for funds to rehabilitate Hollander Ridge under HUD's HOPE VI program. The Local Defendants' original plan was to modernize Hollander Ridge by, among other things, reducing the population density in the development through demolition and reconfiguration of existing units, and upgrading the housing units and amenities. This plan was consistent with the terms of the Consent Decree.

As part of its review of the HOPE VI application, HUD commissioned a viability assessment of Hollander Ridge conducted by Abt Associates, Inc. The September 1996 assessment report (the "Abt report") noted the poor physical condition of the development and concluded that the costs to rehabilitate it in accordance with the Local Defendants' plan were prohibitively high. The Abt report also questioned the viability and marketability of a modernized Hollander Ridge. The report noted, among other things, that the isolation of the site and the unavailability of nearby shopping and health-care facilities made the location unattractive to those seeking family housing, and even more problematic for elderly residents. The Abt report recommended demolishing Hollander Ridge and acquiring or building replacement housing in other areas of the city, which would be a permissible use of HOPE VI funds.

After the Abt report was issued, HUD awarded the Local Defendants $20,000,000 for Hollander Ridge, one-half of the amount sought in the HOPE VI application. After an audit of HUD's 1996 grants, however, the Office of the Inspector General recommended that HUD rescind the Hollander Ridge grant, finding fault with various aspects of HUD's selection process. That recommendation apparently delayed the funding of the Hollander Ridge grant.[1]

The Local Defendants spent the year following the award of the HOPE VI grant attempting to finalize their plans for Hollander Ridge.

_____

[1] There is no indication in the record of the status of this recommendation at the time of the hearing before the district court.

5

They hired experts to determine how the site should be developed, and they expressed their disagreement with the findings of the Abt report. As late as November 1997, the Local Defendants assured HUD that a revitalized Hollander Ridge would be a viable site for family public housing.

However, around December 1997, in the wake of continued public opposition to the Hollander Ridge plan, the Local Defendants devised a completely new plan for Hollander Ridge. The new plan called for the demolition of all existing structures to make way for a "senior village," which would provide approximately 450 housing units for senior citizens only, with enhanced security, on site health care, and transportation services. The senior village was planned as a mixed-income community providing housing for low and moderate income seniors, including those who qualify for public housing.

The plans for the senior village at Hollander Ridge clearly violated Section XII of the Consent Decree. The Local Defendants therefore sought a modification of the Decree to allow them to seek federal funds for the plan.

The facts surrounding Cherry Hill are somewhat similar. Cherry Hill, which was built between 1942 and 1960, is a development of more than 1,700 family public housing units located on a peninsula in southern Baltimore City. In the early 1990s, the Local Defendants developed a strategy for the long-term rehabilitation of Cherry Hill. The plan originally allocated $25,000,000 in public housing funds to renovate more than 350 units of family housing in Cherry Hill. As with Hollander Ridge, the renovation of existing public housing units was consistent with the terms of the Consent Decree.

However, less than a year after entering into the Consent Decree, the Local Defendants presented a new plan for Cherry Hill that included the demolition of some 250 units of family housing, the renovation of 100 units, and the construction of a new, elderly-only building. Like the proposed senior village at Hollander Ridge, the Cherry Hill facility would house mixed-income residents, and would not be dedicated exclusively to public housing. The announcement of the plan to construct senior housing at Cherry Hill came at approximately the same time as the abandonment of a private plan to con-

6

struct housing for the elderly in Cherry Hill. Because the revised Cherry Hill plan also violated Section XII of the Consent Decree, the Local Defendants sought an additional modification of the Consent Decree to allow them to seek federal funds for the Cherry Hill project.

After conducting an evidentiary hearing, the district court believed that substantial changes in circumstances had occurred at Hollander Ridge and Cherry Hill since the entry of the Consent Decree. As to Hollander Ridge, the court decided that only after the Consent Decree did it become apparent that Hollander Ridge could not be modernized to provide family public housing, but that the site could be used to provide housing for the elderly. As to Cherry Hill, the district court concluded that the abandonment of the private plan to build a senior development occurred after the Consent Decree was entered into and amounted to a significant change in circumstance. The district court determined that these changes in circumstance rendered compliance with the Consent Decree detrimental to the public interest. Consequently, the district court amended the Consent Decree to allow the Local Defendants to proceed with their plans for Hollander Ridge and Cherry Hill.**2**

II.

On appeal, the Plaintiffs contend that the Local Defendants failed to carry their burden of demonstrating that the Consent Decree should be modified. We review a district court's decision to modify a consent

_____

**2** The district court noted that the Local Defendants were not seeking a modification that would, in and of itself, allow them to build the Hollander Ridge and Cherry Hill projects. Instead, the Local Defendants were seeking permission only to apply for federal funds for the planned construction. This is a distinction without a difference. As the district court noted, if federal funds were awarded, then the construction would proceed. Moreover, while Section XII of the Consent Decree prohibits the use of public housing funds for the construction or acquisition of housing in impacted areas, it also prohibits the Local Defendants from seeking federal funds for the construction or acquisition of housing in impacted areas. Thus, the Local Defendants' modification request was no less inconsistent with the terms of the Consent Decree than a request to allow construction to begin.

7

decree for abuse of discretion. See Small v. Hunt, 98 F.3d 789, 796 (4th Cir. 1996); Plyler v. Evatt, 924 F.2d 1321, 1324 (4th Cir. 1991).

Under Rule 60(b)(5) of the Federal Rules of Civil Procedure, "a district court may modify a judgment if it is no longer equitable that the judgment should have prospective application. In exercise of that power, consent decrees . . . may be modified in appropriate cases on the basis of material changes in operative law or facts." Plyler, 924 F.2d at 1324 (citation and internal quotation marks omitted). In cases such as this, involving institutional reform litigation, "the unique nature and demands of [such] litigation necessitate a more flexible approach to modification than may be appropriate with respect to consent decrees between private parties." Id. (internal quotation marks omitted); see Rufo v. Inmates of Suffolk County , 502 U.S. 367, 383 (1992) ("[A] district court should exercise flexibility in considering requests for modification of an institutional reform consent decree . . . ."). However, a consent decree will not be modified simply because "it is no longer convenient to live with[its] terms." Rufo, 502 U.S. at 383.

To justify the modification of an institutional reform consent decree, the party seeking the modification "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." Id. "If the movant cites significantly changed factual conditions, it must additionally show that the changed conditions make compliance with the consent decree `more onerous,' `unworkable,' or `detrimental to the public interest.'" Small, 98 F.3d at 795 (quoting Rufo, 502 U.S. at 384). A modification, however, should not ordinarily be granted "where a party relies upon events that actually were anticipated at the time it entered into a decree." Rufo, 502 U.S. at 385.

A. Hollander Ridge

The district court believed that the circumstances surrounding Hollander Ridge had significantly changed because, after the Consent Decree, the Local Defendants realized that Hollander Ridge could not viably be rehabilitated to provide family housing, but that it could be used to provide housing for the elderly. Contrary to the district court's conclusion, however, the Local Defendants' post-Decree "discovery" that Hollander Ridge could not be rehabilitated as family housing can-

8

not be considered a change of circumstance. The reasons that Hollander Ridge could not be rehabilitated, including the need for extensive repairs, the cost of those repairs, and the undesirability of Hollander Ridge because of its isolation, all existed before the entry of the Consent Decree. The only relevant post-Decree event was the issuance of the Abt report, which did not itself render Hollander Ridge unusable as a site for family pubic housing. Instead, the Abt report merely expressed an opinion that the conditions at Hollander Ridge made it unlikely that the Local Defendants' original modernization plan would be economically viable, an opinion with which the Local Defendants at first strongly disagreed. A modification of a consent decree must be based on a change in facts , not a change in opinion about the effect of unchanged facts. See Rufo, 502 U.S. at 384 ("A party seeking modification of a consent decree may meet its initial burden by showing . . . a significant change either in factual conditions or in law." (emphasis added)). Thus, the Local Defendants' changed opinion about the viability of Hollander Ridge as a site for family public housing simply cannot amount to a change of circumstance.

The only remaining justification for the modification as found by the district court, then, is the Local Defendants' present belief that the Hollander Ridge site is a viable location for the senior village. Although there is evidence in the record questioning the viability of the senior village plan, we will assume for the purposes of this opinion that it is in fact viable. However, the viability of the senior village is really beside the point.

The Local Defendants knowingly and voluntarily entered into the Consent Decree and agreed to Section XII, which provides that, until the other obligations under the Decree have been satisfied, any new construction of public housing built with public housing funds must be located in a non-impacted area. The very presence of Section XII makes it clear that the parties contemplated that new construction would be required or desired during the life of the Consent Decree. Given the allegations of the Plaintiffs' complaint--that HUD and the Local Defendants were continuing the formerly de jure segregated housing program through their tenant assignment and site selection policies--Section XII obviously provides an important means of furthering the Consent Decree's stated purpose of "provid[ing] enhanced

9

desegregative housing opportunities for residents of Baltimore City public housing." J.A. 778. By prohibiting the use of public housing funds for new public housing construction in impacted areas, Section XII ensures that Baltimore City public housing residents will be integrated throughout the city. Thus, the change of circumstance found by the district court--the need or desire for new construction--is a circumstance contemplated and anticipated by the parties at the time they entered into the Consent Decree. Indeed, the possibility that new construction would be needed is the very circumstance to which Section XII is specifically directed and the only circumstance that triggers its application. That the proposed housing is for the elderly is of no moment. Section XII prevents the Local Defendants from seeking public funding for the construction of new public housing in any impacted area until the other obligations under the Decree are satisfied; the provision does not limit its reach to the construction of family public housing, nor does it exempt from its reach the construction of public housing for the elderly.

As noted above, a consent decree ordinarily should not be modified "where a party relies upon events that actually were anticipated at the time it entered into a decree." Rufo, 502 U.S. at 385. To warrant a modification based upon an anticipated change of circumstances, the party seeking the modification must "satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)." Id. The district court rejected the Plaintiffs' contention that any change in circumstance was anticipated at the time of the Consent Decree. The court, therefore, did not analyze the Local Defendants' modification request under the proper standard, which clearly amounts to an abuse of discretion. See, e.g., Brodziak v. Runyon, 145 F.3d 194, 196 (4th Cir. 1998) ("[A] court by definition abuses its discretion when it makes an error of law." (internal quotation marks omitted)).

Although the district court did not analyze the case under the correct standard, a remand is not required. The district court held an evidentiary hearing on the modification request, and we have before us a fully-developed record. A review of the record reveals no evidence that the Local Defendants made a reasonable effort to comply with the requirements of Section XII of the Consent Decree, as required by

10

Rufo. For example, there is no evidence that the Local Defendants investigated funding the project through the use of monies not prohibited by Section XII or that they evaluated whether the senior village could be located in a non-impacted area.

While a flexible approach is required when determining whether a given set of circumstances warrants modification of an institutional reform consent decree, that flexibility cannot be used to relieve the moving party of its burden to establish that modification is warranted. See Rufo, 502 U.S. at 383 ("Although we hold that a district court should exercise flexibility in considering requests for modification of an institutional reform consent decree, it does not follow that a modification will be warranted in all circumstances."). The changed circumstances upon which the Local Defendants based their requested modification were contemplated at the time they entered into the Consent Decree, and the Local Defendants failed to establish that they made a reasonable effort to comply with Section XII of the Decree. Under Rufo, therefore, the Local Defendants failed to carry their burden of establishing their entitlement to a modification of the Consent Decree as to Hollander Ridge.

B. Cherry Hill

For largely the same reasons, the Local Defendants have likewise failed to establish that the Consent Decree should be modified to allow the Cherry Hill project to proceed.

The change of circumstance found sufficient by the district court--abandonment of the planned private senior housing--amounts to no more than a conclusion that the Local Defendants needed or wanted to build new housing in Cherry Hill. As previously discussed, the need in the future for construction of new housing was a circumstance contemplated at the time of the Consent Decree. And again, as with Hollander Ridge, the evidence in the record establishes that the Local Defendants did not make any reasonable efforts to comply with Section XII of the Consent Decree before seeking its modification.

The evidence at the hearing established that alternate sources of funding for the Cherry Hill project are available, sources that could be used for new construction consistent with the terms of Section XII.

11

The Local Defendants did not apply for or apparently even consider using those alternate funding sources, nor is there any evidence that the Local Defendants considered locating the proposed project in a non-impacted area. Because the Local Defendants presented no evidence that they made reasonable efforts to comply with Section XII with regard to Cherry Hill, they are not entitled to a modification of the Decree under Rufo.**3**

III.

In 1996, faced with claims that they were perpetuating the effects of Baltimore's former official policy of segregation in public housing, the Local Defendants went before the district court asking for approval of an agreement that resolved a portion of the claims raised by the Plaintiffs. The district court approved the agreement, thus giving the agreement the status of an official court order. Yet only months after the court's approval of the agreement through the entry of the Consent Decree, the Local Defendants began considering development plans that were in conflict with the terms of the Consent Decree, terms that the Local Defendants presumably believed were in the public's interest when they agreed to the settlement. And less than two years after agreeing to those terms, the Local Defendants were back before the district court asking for relief from the Decree that they had so recently asked be approved. While Rufo teaches that consent decrees arising from institutional reform litigation are not written in stone and can be modified upon a proper showing, the fact that such a consent decree can be modified does not give the parties to the decree a license to ignore their obligations under the decree. As the Supreme Court noted in Rufo, a consent decree should not be modified simply because "it is no longer convenient to live with [its] terms." Rufo, 502 U.S. at 383.

_____

**3** The Plaintiffs contend that the abandonment of the private project occurred before the Consent Decree was entered into and that there is no evidence in the record that the abandonment of the private project actually motivated the Local Defendants' decision to revise their plans for Cherry Hill. Because we conclude that Local Defendants failed to establish that a modification is appropriate, we need not address these factual disputes.

12

We fully recognize that there is public support for the Local Defendants' plans for Hollander Ridge and Cherry Hill, particularly for the Cherry Hill project. And we also recognize that the planned projects would serve the needs of some residents of Baltimore's public housing system. Those facts, however, are insufficient to allow the Local Defendants to modify the Consent Decree. By prohibiting the use of public funds for new public housing construction in impacted areas, Section XII of the Consent Decree reflects a rational, negotiated-for allocation of scarce public housing funds that serves the needs of other residents of Baltimore's public housing system. The Local Defendants sought relief from Section XII based on changes in circumstances that were contemplated at the time of the Decree and that were the only circumstances that would trigger its application. Therefore, under Rufo, the Consent Decree could be modified only if the Local Defendants satisfied the "heavy burden" of establishing that they "made a reasonable effort to comply with the decree." Rufo, 502 U.S. at 385. Because the Local Defendants did not establish that they made reasonable efforts to comply with Section XII before seeking its modification, they failed to carry their burden. The district court, therefore, abused its discretion by granting the motion to modify the Consent Decree. Accordingly, the district court's order modifying the Consent Decree is hereby reversed.[4]

REVERSED

_____

[4] Our disposition of the case makes it unnecessary for us to consider the other arguments raised by the Plaintiffs, including whether the district court improperly reduced the Local Defendants' burden to establish the need for the modifications.

13